

**IT IS SO ORDERED.
Signed October 28, 2014**

*Arthur S. Weissbrodt*

**Arthur S. Weissbrodt
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 12-50227-ASW |
| OCTAVIO CASAS and MICHELLE ALLISON SCOTT-CASAS, | Chapter 13 |
| Debtors. | Date: September 5, 2014 |
| | Time: 9:30 a.m. |

**MEMORANDUM DECISION GRANTING MOTION TO VALUE
PROPERTY AND TO AVOID LIEN**

This matter comes before the Court on a motion filed by the Debtors, Octavio Casas and Michelle Allison Scott-Casas, asking the Court to value the Debtors' residence located at 2250 Monroe Street #179, Santa Clara, California ("the Property"), for purposes of avoiding a junior lien held by Creditor JPMorgan Chase Bank, NA ("the Creditor").  At an evidentiary hearing held on September 5, 2014, the Debtors were represented by attorney Paul Seabrook.[1]  The Creditor was represented by attorney Jonathan Damen.

---

[1] The Debtors' counsel of record is Theresia Sandhu, but Ms. Sandhu did not appear at the hearing.  Mr. Seabrook, who works with Ms. Sandhu, appeared in lieu of Ms. Sandhu.

The parties agree that the Property is subject to a senior lien held by Wells Fargo Bank in the unpaid amount of $186,166.81. At the hearing, both sides presented evidence of the Property's value relative to the senior lien. In addition to offering testimony from Debtor Michelle Allison Scott-Casas, the Debtors offered testimony from Mr. Zaid Hanna, a real estate agent and broker, that the Property had a value of $183,000 on the petition date -- which is $3,166.81 less than the amount owed to Wells Fargo Bank. By contrast, the Creditor offered testimony from licensed appraiser Mr. Denis DeSaix that the Property had a value of $193,000 on the petition date -- which is $6,833.19 more than the amount owed to Wells Fargo Bank. Both sides also filed briefs prior to the hearing.

For the reasons which follow, the Court is not persuaded that the value of the Property on the petition date was greater than $186,166.81. Therefore, the Debtors' motion seeking to avoid the junior lien is granted. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**I. Findings of Fact**

The Debtors filed a petition under chapter 13 of the Bankruptcy Code on January 12, 2012. When the petition was filed and thereafter, the Debtors resided at the Property.

As discussed _supra_, the unpaid amount of the senior lien held by Wells Fargo Bank is $186,166.81. The Creditor's proof of claim filed in this case is premised on a junior lien in the amount of $101,812.17. The claim is silent as to the value of the Property.

## A. Testimony of Ms. Scott-Casas

Ms. Scott-Casas testified about the Property, which the Debtors purchased in May 2004. The Property is a one-bedroom, one-bathroom condominium measuring approximately 714 square feet.[2] Originally, the Property was an apartment, but at some point before the Debtors bought the Property, the apartments in the complex were converted into condominiums. The Debtors have lived in the Property since May 2004, and currently reside there with two daughters aged 11 and 13.

Ms. Scott-Casas stated that it is challenging for four people to live in such a compact space and discussed the condition of -- and "wear and tear" on -- the Property as of the date when the petition was filed. On the petition date, the carpet was original to the Property and was buckling and stained, particularly in the high traffic areas. Also, there was a loose door knob with a broken locking mechanism, there were electrical problems involving the ceiling fan and some electrical outlets, and there was water damage in the hallway under the carpet where a washing machine had flooded. Ms. Scott-Casas acknowledged that some other units had electrical issues, as well, but did not specify any. The Property also had plumbing issues with a sink and bathtub, which "backed up" regularly.

_____

[2] During the hearing, there was some discussion about whether the Property was actually 714 square feet. The Creditor's appraiser measured the Property at 674 square feet, but the appraiser thought that if the patio area were included, then the square footage would be over 700. The actual square footage, however, is not relevant, because the comparable properties considered by both parties' witnesses shared floor plans identical to the Property.

Ms. Scott-Casas also testified about a mold problem at the Property which existed when the petition was filed and still existed at the time of the hearing. Ms. Scott-Casas reported that the mold issue was related, in part, to the 27-year old, single-paned windows which were original to the Property. Moisture collected on the windows, window frames, and sills, and Ms. Scott-Casas frequently wiped the moisture from these areas. Ms. Scott-Casas testified that there was visible mold growing in six areas: near the windows, by the sliding glass doors, and in the bedroom. To address the mold, Ms. Scott-Casas sprayed a bleach mixture and moved the children's bunk bed away from one of the moldy areas.

Ms. Scott-Casas reported that on September 4, 2014, the day before the hearing, a mold specialist came to the Property. After a 40-minute inspection, the mold specialist confirmed the presence of mold in the six different areas. The mold specialist did not testify at the hearing, but Ms. Scott-Casas testified that the specialist sent Ms. Scott-Casas an e-mail containing a general estimate for the cost of repair. The e-mail, which was offered and admitted into evidence, was written by Don Chamberlin, South Bay Project Manager, and states: "Mold is present on the window framework in the Living Room, Dining Room, Kitchen and the Bedroom. Mold is also present on the ceiling above the tub/shower in the bathroom. In the bedroom mold is growing on the drywall at the corner of the exterior and interior wall." The mold specialist estimated the cost of mold remediation to be $4,000 to $5,000. Ms. Scott-Casas explained that this estimate did not include $1,500 for drywall replacement, repair, and painting.

Ms. Scott-Casas stated that at one time, there had been an opportunity to upgrade the windows from single-paned to double-paned windows at a cost of $8,000,[3] and that many units in the complex had taken advantage of that opportunity. However, Ms. Scott-Casas stated that the Debtors could not afford the upgrade when it was offered.

### B. Testimony of Zaid Hanna

The Debtors called Zaid Hanna, a real estate agent and broker, to testify about the value of the Property. Mr. Hanna has been a real estate agent with Intero Real Estate Services for more than 10 years, and has been a broker since 2008. As an agent, Mr. Hanna has worked on an average of 30 to 45 real estate transactions per year.

Mr. Hanna is not a licensed appraiser, has no appraiser certifications, and has not been trained as an appraiser. However, in his role as an agent and in every real estate transaction, Mr. Hanna assesses the value of real estate on behalf of his clients. Approximately 10% of Mr. Hanna's training as an agent involved learning how to value property. Mr. Hanna explained that when Mr. Hanna assesses value for a particular property, Mr. Hanna looks at the property being assessed, looks for disclosures about the property made during inspections, then looks at sales of comparable properties for the 90-day period before the valuation date.

---

[3] The offer to upgrade the windows at a cost of $8,000 was not discussed in detail, but it appears to have been a special price offered to all property owners within the complex. It is not clear how many windows would have been replaced or what quality windows would have been installed for that price. It is entirely possible that an owner would have to pay more than $8,000 to have the windows upgraded outside the special offer.

For purposes of valuing the Property, Mr. Hanna visited the Property on March 14, 2014. Mr. Hanna concluded that the Property was in below-average condition; there was mold and mildew, there was damage to the entrance door, there was quite a bit of wear and tear on the carpet, and the Property was cluttered. During Mr. Hanna's visit, Ms. Scott-Casas called Mr. Hanna's attention to an electrical problem in the kitchen, an issue with a broken door knob, discoloration by the window sills and in the bathroom, the mildew and mold in numerous places, and a lack of ventilation in the bathroom. Ms. Scott-Casas told Mr. Hanna that all of these problems were present at the Property in January 2012.

Mr. Hanna admitted that Mr. Hanna is not an expert on mold, but stated that such discoloration is, in his experience, usually a fungus. Mr. Hanna thought that replacement of the single-paned windows with double-paned windows would alleviate the problem, along with an application of mold-killing fungicide. Mr. Hanna acknowledged that the installation of double-paned windows would be considered an upgrade, and that other owners might have elected to upgrade the windows to reduce noise or to prevent mold damage. Mr. Hanna also stated that the ventilation in the bathroom needed to be improved.

Mr. Hanna stated that he would not recommend a unit with mold to a buyer-client if there were an available unit without mold, and that Mr. Hanna would recommend exploring other options to such a buyer. However, if there were no other options, then Mr. Hanna would determine the cost of repairs and would factor that cost into any offer to buy a property.

Mr. Hanna prepared a Broker's Price Opinion ("the BPO") for the Property. The BPO was offered and admitted into evidence. Mr. Hanna explained that the BPO analyzes several comparable properties, as does an appraisal. However, a BPO is not a formal appraisal and is less detailed than an appraisal. Mr. Hanna also explained that, unlike an appraisal, a BPO generally is used to determine a property's list price and recommended sale price, rather than after a contract to sell/buy real estate is entered.

Mr. Hanna's BPO covered the period of September 1, 2011 through December 31, 2011. In the BPO, Mr. Hanna used three prior sales for comparison -- properties which sold before the bankruptcy petition date. All three comparable properties (or comparables) were located within the same complex as the Property, had an address of 2250 Monroe Street in Santa Clara, California, and had identical floor plans and square footage to the Property. All three comparables also involved "as is" short sales. According to the BPO, the Property is located on the ground floor. Mr. Hanna did not specify whether the comparables were also on the ground floor, although other evidence showed that only one was a ground floor unit.[4]

The first comparable property ("Hanna 1") was Unit 135. Hanna 1 was originally listed for sale at a price of $195,000, but it sold for $193,000 on September 26, 2011. The second comparable property ("Hanna 2") was Unit 244. Hanna 2 sold above its $190,000 list price for $193,500 on September 8, 2011. The third comparable

---

[4] The Creditor's appraiser testified that only the first of Mr. Hanna's comparables was located on the ground floor, but that the other two comparables were located on the second floor.

property ("Hanna 3") was Unit 221. Hanna 3 had a list price of $170,000, but it sold for $185,000 on September 3, 2011.

According to the BPO, all three comparables were in "good" condition, whereas the Property was in "poor" condition. Mr. Hanna did not explain, specifically, how Mr. Hanna determined the condition of each comparable. In fact, Mr. Hanna admitted that Mr. Hanna did not know whether the comparables had issues similar to those at the Property.[5] However, the MLS listing for Hanna 1 -- on which Mr. Hanna relied as a data source in preparing his BPO -- described Hanna 1 as being in "excellent condition."

Mr. Hanna estimated that the cost of repairing all of the deferred-maintenance problems at the Property would total $8,025, and Mr. Hanna adjusted the value of the comparables downward by $8,000 to account for this estimated cost. In deriving the $8,025 cost of repairs, Mr. Hanna assumed that it would cost $3,000 to replace the windows in the living room and bedroom with dual-paned windows.[6] Mr. Hanna based this estimate on Mr. Hanna's experience in working with investors who "flip" properties. Mr. Hanna is not a licensed contractor, but Mr. Hanna stated that buyers have relied on Mr. Hanna to estimate repair costs for distressed properties in approximately 35 different transactions. The BPO also estimated the following repair costs: $1,100 for mold in the bathroom wall;

[5] The Court understands that, as a matter of standard practice, appraisers and those giving BPOs usually do not or cannot inspect comparable properties to determine their actual condition inside.

[6] Mr. Hanna did not reconcile this $3,000 estimate with the $8,000 window replacement offer which had been made to property owners within the complex. His $3,000 estimate probably was significantly understated.

$850 for water damage to the entrance door; $850 for electrical issues in the kitchen; $75 for the door knob; $100 for a baseboard; $1,400 for the carpets; $250 for the ceiling fan; and $400 for a broken garbage disposal.

Based on Mr. Hanna's analysis, Mr. Hanna determined that the value of the Property in January 2012 was $183,000. Mr. Hanna noted that if the Property had been sold at that time, it would have been in an "as is" short sale, and that a high percentage of sales at that time were "as is" short sales. In Mr. Hanna's estimation, 75% to 80% of sales in January 2012 were "as is" short sales. Mr. Hanna also believed that the Property would have sold for $183,000.

### C. Testimony of Denis DeSaix

The Creditor called Denis DeSaix, a licensed real estate appraiser, to testify about the value of the Property. Mr. DeSaix has worked as a real estate appraiser for more than 20 years, and has received significant training as an appraiser. Mr. DeSaix has received more than 450 hours of training for license designations, and every four years, Mr. DeSaix repeats 55 hours of training to maintain his state certification. Mr. DeSaix is also a designated member of the Appraisal Institute with an SRA designation. To maintain that designation, Mr. DeSaix must complete another 100 hours of training every four years. Notwithstanding this extensive training, Mr. DeSaix admitted that he is "not quite MAI," a different designation than SRA.

Mr. DeSaix is frequently hired by clients to provide opinions on the market value of properties. Approximately 80% of Mr.

DeSaix's customers are lenders. Mr. DeSaix estimated that another 5% to 10% of his appraisals are performed for buyers, and another 10% of his appraisals are performed for investors.

Mr. DeSaix has evaluated both residential and commercial properties, although during his first twenty years of working as an appraiser, his work was strictly residential. Mr. DeSaix estimated that he has performed approximately 3,000 appraisals of single family residences, including at least one appraisal of a condominium in the same complex as the Property.

Mr. DeSaix explained that appraisers are trained differently than real estate brokers or agents regarding how to value properties. According to Mr. DeSaix, appraisers are taught how to identify the valuation problem, how to select the correct methodology to apply to the problem, how to identify the relevant market, how to analyze market conditions, how to identify which elements of comparison are significant, and how to apply market-supported adjustments. Mr. DeSaix explained that appraisers must provide market data to support the valuation and, as a result, appraisals are the "gold standard" when compared with BPOs.

Mr. DeSaix prepared a retrospective appraisal of the Property's value as of the petition date, January 12, 2012. The appraisal was offered and admitted into evidence. The appraisal includes Mr. DeSaix's observations during his inspection of the Property, a market analysis, an evaluation of comparable sales, and a conclusion of value. After considering all relevant factors, and using a sales comparison approach, Mr. DeSaix concluded that the Property's fair market value on the petition date was $193,000.

To prepare the appraisal, Mr. DeSaix walked through the condominium complex, visited the interior of the Property, and met with Ms. Scott-Casas. During that visit, Mr. DeSaix discussed some of the problems at the Property with Ms. Scott-Casas. Ms. Scott-Casas mentioned the electrical and ventilation problems, as well as the problems with the windows. According to Mr. DeSaix, there was no specific discussion about mold, but Mr. DeSaix did observe a mold-like substance in multiple locations. Mr. DeSaix stated that mold is a common problem in the properties which Mr. DeSaix has appraised, and that Mr. DeSaix has witnessed extensive mold infestations, but "this was not it."

Mr. DeSaix assumed, in what he termed an "extraordinary assumption," that the condition of the Property during his inspection was the same as when the petition was filed. Mr. DeSaix also presumed that similar units on the ground floor shared problems similar to those at the Property. However, Mr. DeSaix did not inspect any of the other units or have evidence of their actual conditions (other than the content of the MLS listings). Mr. DeSaix testified that Ms. Scott-Casas mentioned other problems in the complex, including ant infestations. Mr. DeSaix also testified that he told Ms. Scott-Casas that there appeared to be problems inherent in the building, and that Ms. Scott-Casas agreed. Nevertheless, there was no evidence offered of any specific problems in other units at the complex.

Mr. DeSaix looked at, and considered MLS information for,[7] four comparables. The first three comparables were from the same complex as the Property, shared the exact same floor plan, and were ground floor units. The fourth was in a nearby complex.

Mr. DeSaix's first comparable property ("DeSaix 1") was the same property as Hanna 1. DeSaix 1 sold "as is" in a short sale for $193,000 in September 2011. As discussed <u>supra</u>, per the MLS listing, DeSaix 1 was described as being in "excellent condition."

Mr. DeSaix thought it preferable for the second and third comparables ("DeSaix 2" and "DeSaix 3," respectively) to be ground level units, because Mr. DeSaix thought that the ground floor units would share some of the same condition issues as the Property. DeSaix 2 was Unit 191, was listed for sale at $202,000,[8] and sold for $200,000 in July 2011. Per the MLS listing, DeSaix 2 was in "great condition . . . beautifully presented and ready for the new owner." The MLS listing also stated that DeSaix 2 had the best location in the complex and overlooked the lawns and swimming pool. The MLS listing further reported that DeSaix 2 had double-paned windows. By contrast, the Property has single-paned windows and does not overlook the pool, although Mr. DeSaix testified that the Property does have a view of the lawns and that the recreation area is in sight of the Property.

---

[7] Mr. DeSaix's appraisal makes specific reference to the MLS listings which Mr. DeSaix considered. The MLS listings for the first three of Mr. DeSaix's comparables were included in the Debtors' exhibits.

[8] The list prices were not included in Mr. DeSaix's appraisal. However, the MLS listings identified the list prices for the first three of Mr. DeSaix's comparables.

DeSaix 3 was Unit 122. DeSaix 3 was originally listed for sale at a price of $219,999, but the list price was lowered to $192,000. DeSaix 3 sold for $192,000 in an "as is" short sale in June 2011. The MLS listing for DeSaix 3 did not describe the condition of DeSaix 3, and there was no other evidence submitted about the condition of DeSaix 3.

The fourth comparable property ("DeSaix 4") was in a nearby complex across the street and was located at 2201 Monroe Street #1104, Santa Clara, California. Mr. DeSaix explained that Mr. DeSaix did not give much weight to DeSaix 4, which was similar to the Property but was larger at 790 square feet, was one year younger than the Property, and was not in a gated community. DeSaix 4 was a second floor unit in good condition which was listed for sale at $183,900 but sold for $194,000 on January 18, 2012, in an REO sale.

Mr. DeSaix did not make any adjustments to DeSaix 1 or DeSaix 3. Mr. DeSaix believed that DeSaix 1 and DeSaix 3 shared the same impairments as the Property; however, Mr. DeSaix offered no facts in support of this belief. Mr. DeSaix made a negative adjustment of $7,500 to DeSaix 2, because DeSaix 2 had been upgraded with new carpet, dual-paned windows, and fresh paint. Mr. DeSaix derived the $7,500 deduction by subtracting the sale prices of DeSaix 1 and DeSaix 3 from the sale price of DeSaix 2, then taking the average.[9] According to Mr. DeSaix, these price differentials were a reflection of the market's reaction to the upgrades in DeSaix 2.

---

[9] The $7,500 deduction was not correlated to the cost of replacing the single-paned windows with double-paned windows. Mr. DeSaix stated that he did not know what it would actually cost to replace the windows. As discussed above, there were many problems with the Property in addition to the windows.

1  In deciding on a value of $193,000 for the Property, Mr. DeSaix

2  determined that DeSaix 1 was most similar to the Property and

3  required no condition adjustments.

4      Mr. DeSaix also made no adjustments to the valuations for

5  short sales or traditional sales.  Mr. DeSaix determined that more

6  than two-thirds of the properties sold during the relevant time

7  period were distressed properties.  Short sales comprised 40% of

8  the market, and REO sales were another 29% of the market.  Mr.

9  DeSaix stated that these distressed sales were driving the market

10 during that time, and traditional sales had to compete with the

11 distressed sales.  Therefore, Mr. DeSaix determined that no

12 adjustment was appropriate to account for the type of sale.

13     Mr. DeSaix also conducted a market analysis for various time

14 periods.  At first, Mr. DeSaix looked back at a two-year period,

15 then at a one-year period, to capture the market dynamics.  Mr.

16 DeSaix then evaluated the June 2011 to January 2012 time period.

17 In this analysis, Mr. DeSaix found that sale prices were correlated

18 to property size, indicating that the market was relatively stable.

19 For this reason, Mr. DeSaix felt comfortable and confident using

20 sales up to seven months old.

21     Mr. DeSaix also conducted an analysis of average one-bedroom

22 condominiums in a nearby geographic area from the June to January

23 time period, but did not include that analysis in his report.  Mr.

24 DeSaix testified that the data were not significantly different

25 from Mr. DeSaix's conclusion and did not show anything

26 contradictory, so Mr. DeSaix discounted that analysis.  Mr. DeSaix

27 also stated that there were not many data points.  However, Mr.

28 DeSaix acknowledged that the analysis could have had an impact on

the valuation of up to a few thousand dollars.  Mr. DeSaix stated that the market is imperfect, and that a 2% to 3% difference is "market noise."

## II. Conclusions of Law

This is a very close case.  The Debtors' and the Creditor's assertions of the Property's value are only $10,000 apart, and are each within only a few thousand dollars of the $186,166.81 owed to the senior lienholder, Wells Fargo Bank.  The Debtors' proposed value is 98.3% of the amount owed to Wells Fargo Bank, and the Creditor's proposed value is 103.7% of the amount owed to Wells Fargo -- a 5.4% spread.  Nevertheless, on the instant record, the Court cannot find that the Property's value on the petition date exceeded $186,166.81.

The Debtors' motion is brought under 11 U.S.C. § 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

Initially, the Debtors bear the burden of overcoming any presumption that the value of the Property stated in the Creditor's proof of claim is the correct value.  See In re Postolica, 2012 WL 1035900, at *5 (Bankr. N.D. Cal. 2012) (citing In re Southmark Storage Associates Ltd. Partnership, 130 B.R. 9, 10 (Bankr. D. Conn. 1991)).  Once the Debtors meet this burden, it then becomes the Creditor's burden of persuasion to demonstrate the value of the collateral by a preponderance of the evidence.  Id.  Here, the

15

Debtors' burden is satisfied, because the Creditor's proof of claim did not specify the value of the Property. Therefore, it is the Creditor's burden to persuade this Court that the Property's value on the petition date exceeded $186,166.81.

The parties agree that the Property's value should be fair market value. This is consistent with the applicable law. See Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997); Taffi v. United States (In re Taffi), 96 F.3d 1190, 1192 (9th Cir. 1996). Fair market value is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." Taffi, 96 F.3d at 1192. Nevertheless, this Court does not need to determine the exact value of the Property, and instead only needs to determine whether the Creditor has demonstrated, by a preponderance of the evidence, that the value of the Property at the time of the Debtors' bankruptcy petition exceeded $186,166.81. See In re Serda, 395 B.R. 450, 453 (Bankr. E.D. Cal. 2008).

Here, the Creditor has provided an appraisal from Mr. DeSaix, an experienced and certified appraiser, as to the Property's value. Without question, the appraisal is more detailed and in many ways more scientific than the BPO prepared by Mr. Hanna. However, Mr. DeSaix's appraisal is premised upon unsupported assumptions about the conditions of the comparable properties.

Mr. DeSaix's determination of value was based, in large part, on the assumption that DeSaix 1 was most similar to the Property, and on the assumption that DeSaix 1 and DeSaix 3 were impaired to the same degree as the Property. However, the evidence in the

record contradicts these key assumptions.  As a result, Mr. DeSaix's appraisal is not reliable.

Virtually the only real evidence of the condition of Mr. DeSaix's comparables were the MLS descriptions.  DeSaix 1 was described as being in "excellent condition."  DeSaix 2 had dual-paned windows, was described as being in "great condition . . . beautifully presented and ready for the new owner," and had the best location in the complex, overlooking the lawn and the swimming pool.  The MLS listing for DeSaix 3 contained no description of the condition of DeSaix 3.

By contrast, the Property was not in excellent condition -- far from it.  There was substantial mold damage, which was visible to the naked eye in six locations and which would be expensive to repair.  There were also electrical problems, a stained and buckling carpet, water damage in the hallway, a loose and broken door knob, recurring plumbing issues, and poor ventilation in the bathroom.  Compounding these problems, the Debtors deferred maintenance on the Property, which houses four people in very close quarters.  The totality of the evidence presented to the Court -- including the testimony of all three witnesses, the appraisal, the BPO, and the other evidence -- shows that the Property was, and remains, in comparatively poor condition.  Therefore, the assumption that the Property was most similar to DeSaix 1 and should be valued at the sale price of DeSaix 1 was not at all supported.  Rather, it was directly contradicted by record evidence.

Without question, DeSaix 2 was also superior to the Property.  Although Mr. DeSaix made a $7,500 adjustment to DeSaix 2 to account

for upgrades made at DeSaix 2, the amount of this adjustment was tied to Mr. DeSaix's erroneous assumption that DeSaix 1 was similar to the Property. The Property was in substantially and significantly worse condition than DeSaix 1. Further, there was no evidence as to whether similar upgrades had been made to DeSaix 1 or DeSaix 3. For instance, there was no evidence as to whether the single-paned windows in DeSaix 1 and DeSaix 3 had been replaced with double-paned windows. There also was no evidence of mold, or a lack of mold, at DeSaix 1 and DeSaix 3. These two comparables might have had no mold and superior, double-paned windows. The Court finds that evidence of mold in DeSaix 1 would have been inconsistent with the MLS description that it was in "excellent condition." Therefore, the Court also finds that DeSaix 1 did not have mold infestation, as did the Property.

As Mr. Hanna testified, from a buyer's perspective, a property without mold is preferable to a property with mold, and the presence of mold would affect the amount of a buyer's offer. This testimony was not refuted. The Court agrees with Mr. Hanna in this regard and extrapolates that a buyer would view double-paned windows as superior to single-paned windows, and that a property with double-paned windows would fetch a higher price than a property without them.

If DeSaix 1 and DeSaix 3 had double-paned windows, then an adjustment should have been made to the sale prices of DeSaix 1 and DeSaix 3 to account for the Property's single-paned windows. Such an adjustment might have ranged from as low as Mr. Hanna's $3,000 estimate to the $8,000 "special price" offer to upgrade the windows which had been extended to property owners within the complex, or

possibly more. However, Mr. DeSaix did not make any such adjustment to DeSaix 1 or DeSaix 3 for the windows.

In addition, regardless of the windows, Mr. DeSaix's assumption about the similarities between the Property and DeSaix 1 and DeSaix 3 is, potentially, a $6,500 assumption. As Ms. Scott-Casas testified, it could cost up to $6,500 or more to remediate the mold and to repair and paint the drywall. If DeSaix 1 and DeSaix 3 did not share this mold problem -- or if DeSaix 1 truly were in "excellent condition," as stated in the MLS listing -- then it would have been appropriate to make a negative adjustment to the values of those two comparable properties to account for the Property's relatively poor condition. If an adjustment of $6,500 were made to account for the cost of remediation, then the adjusted value of DeSaix 1 would have been $186,500, and the adjusted value of DeSaix 3 would have been $185,500 -- both within a stone's throw on either side of the $186,166.81 owed to Wells Fargo Bank, accounting only for the mold issue.

Accounting, then, for "market noise" -- the term used by Mr. DeSaix -- it is quite likely that the fair market value of the Property was below $186,166.81 when the petition was filed. Mr. DeSaix testified that a 2% to 3% deviation in a property's value is not statistically significant. Prior to any negative adjustments to DeSaix 1 and DeSaix 3 to account for the Property's comparatively poor condition -- adjustments which ought to have been made, but were not made, by Mr. DeSaix -- the parties' proposed values are only 5.4% apart and straddle the amount owed to Wells Fargo by 1.7% (on the Debtors' side) and 3.7% (on the Creditor's side). Once negative adjustments are made to DeSaix 1

and DeSaix 3 to account for the Property's comparatively poor condition, the spread is even smaller. A negative adjustment of $6,500 to DeSaix 1 would bring the adjusted value of DeSaix 1 to within 0.2% of Wells Fargo Bank's lien, and only 1.9% from the Debtors' proposed value. This places the Debtor's proposed value within the market noise range.

Put simply, the Creditor did not meet its burden to persuade the Court that the Property's value exceeded $186,166.81 on the petition date. Rather, the preponderance of the evidence demonstrated that the value of the Property was below $186,166.81 on the petition date. Therefore, the Debtors' motion to avoid the Creditor's lien is granted.

**IT IS SO ORDERED.**

**\*\*\* End of Memorandum Decision \*\*\***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Court Service List

Paul Seabrook
Theresia C. Sandhu
Law Offices of Theresia C. Sandhu
145 George St.
San Jose, CA 95110

Jonathan J. Damen
Routh, Crabtree and Olsen PS
1241 E Dyer Rd. #250
Santa Ana, CA 92705